UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ALEXIS EDELSTEIN,<br><br>                    Petitioner,<br>  vs.<br><br>TARA MICHELLE NELSON,<br><br>                    Respondent. | Case No.: 2:25-cv-00003-GMN-MDC<br><br>**ORDER ACCEPTING AND ADOPTING R&R** |

      Pending before the Court is the Report and Recommendation ("R&R") by Magistrate Judge Couvillier, (ECF No. 35), recommending that Petitioner Alexis Edelstein's Petition, (ECF No. 1), be denied and any request for fees and costs by denied. The R&R also recommends denying as moot Respondent Tara Michelle Nelson's Motion to Dismiss, (ECF No. 18). Petitioner filed an Objection, (ECF No. 37), and Respondent filed a Response, (ECF No. 38). For the reasons discussed below, the Court **ACCEPTS AND ADOPTS IN FULL** Magistrate Judge Couvillier's R&R.

I.    <u>**BACKGROUND**</u>

      This case arises out of a dispute between Petitioner Alexis Edelstein, father of infant E.E., and Respondent Tara Michelle Nelson, E.E.'s mother. (*See generally* Pet., ECF No. 1). The Court set forth the details of Petitioner's claim in its prior Order Denying Emergency Motion for Temporary Restraining Order, (ECF No. 15), and incorporates that background information herein.

      On March 24, 2025, the parties appeared before Magistrate Judge Couvillier for a day long Evidentiary Hearing. (*See* Evidentiary Hr'g Mins., ECF No. 30). Both Petitioner and Respondent called multiple witnesses and admitted many exhibits into evidence. (*See id.*). The parties also submitted post evidentiary hearing briefs, (ECF Nos. 33, 34). Magistrate Judge

Couvillier then entered his R&R which recommends that Petitioner's Petition, (ECF No. 1), be denied and any requests for attorneys' fees and costs denied. (*See generally* R&R, ECF No. 35). The R&R also recommends denying as moot Respondent's Motion to Dismiss. (*See id.*). Petitioner timely filed an Objection to the R&R, which the Court considers below.

## II. LEGAL STANDARD

A party may file specific written objections to the findings and recommendations of a United States Magistrate Judge made pursuant to Local Rule IB 1-4. 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2. Upon the filing of such objections, the Court must make a *de novo* determination of those portions to which objections are made. *Id.* The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. R. IB 3-2(b).

## III. DISCUSSION

The Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") is a multilateral international treaty on parental kidnapping to which the United States and Argentina are signatories. The goal of the Hague Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, preamble, T.I.A.S. no. 11670 [hereinafter *Hague Convention*]. The objects of the Convention are: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Hague Convention*, art. 1. The Hague Convention applies where a child has been removed or retained away from his or her habitual residence in breach of the custody rights that the petitioner (parent) was exercising at the time of the wrongful removal or wrongful retention. *Hague Convention*, art. 3.

The United States has implemented the Hague Convention by enactment of the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11611. Under ICARA, state and federal district courts have concurrent jurisdiction over claims arising under the Convention. 42 U.S.C. § 11603(a). Furthermore, ICARA vests these courts with the authority to order the return of wrongfully removed or retained children. *See* 42 U.S.C. § 11603. At bottom, the Hague Convention and ICARA seek to return children to their country of habitual residence for the resolution of any custody dispute, and to avoid international forum shopping. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1003–04 (9th Cir. 2009); *Valenzuela v. Michel*, 736 F.3d 1173, 1176 (9th Cir. 2013) ("The central purpose of the Convention is to prevent forum shopping in custody battles."); *Hague Convention*, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue"). ICARA proceedings merely determine which nation should hear the underlying custody claim.[1] *See Culculoglu v. Culculoglu*, No. 2:13-CV-00446-GMN, 2013 WL 1413231, *3 (D. Nev. Apr. 4, 2013) (citing *Blondin v. Dubois*, 189 F.3d 240, 245 (2nd Cir. 1999)).

Petitioner does not object to Magistrate Judge Couvillier's determination that E.E. was not wrongfully removed from Argentina.[2] (*See generally* Obj.). Instead, Petitioner objects to the Magistrate Judge's finding that E.E. was not wrongfully retained in Nevada. (*See id*.). The Court only addresses the portions of the R&R to which objections were made.

---

[1] Petitioner argues that the Magistrate Judge erred when he stated that "the issue before the Court . . . is to determine which court has jurisdiction to determine custody." (Obj. 2:6–7). He further contends that "this case has nothing to do with jurisdiction" and "[t]he wrong identification of the issue had a significant impact on the [R&R's] legal analysis." (*Id*. 2:9–10; 2:18–19). The Court disagrees. "The Convention's focus is [] *whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be." *Holder v. Holder*, 392 F.3d 1009 (9th Cir. 2004) (emphasis in original). Accordingly, Magistrate Judge Couvillier did not err when he stated that this matter raises jurisdictional questions.

[2] Nor does Petitioner object to the Magistrate's recommendation to deny any requests for attorneys' fees and costs or deny as moot Respondent's Motion to Dismiss. (*See generally* Obj.). The Court therefore need not address those portions of the R&R.

As the Magistrate Judge stated, in determining whether a child has been wrongfully retained from his habitual residence, a court must ask the following questions: (1) "When did the removal or retention at issue take place?"; (2) "Immediately prior to the removal or retention, in which state was the child habitually resident?"; (3) "Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?"; and (4) "Was the petitioner exercising those rights at the time of the removal or retention?" *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001). The Petitioner must establish the merits of a wrongful-removal petition by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A). The petitioner bears the initial burden of showing that the removal or retention was wrongful. *Id.* The burden then shifts to the respondent to demonstrate the applicability of any affirmative defenses. *Id.* § 9003(e)(2).

**A. Child's Habitual Residence**

The Court begins by discussing E.E.'s habitual residence. If E.E.'s habitual residence is in the United States, then there could be no wrongful retention. While an actual agreement between the parents as to where they intended to settle is not required, it is a factor, among many, that a court can consider. *See Monasky*, 589 U.S. 68, 79–81; *see also Farr v. Kendrick*, 824 F. App'x 480 (9th Cir. 2020) (upholding a district court's finding regarding the parents' shared settled intent.). The Court begins by addressing whether there was an actual agreement to live in the United States before turning to other relevant factors.

**1. Actual Agreement**

Magistrate Judge Couvillier found that the parties agreed to reside in Nevada. (R&R 8:19). Petitioner objects to this determination, arguing that the parties never agreed to reside in Nevada and were only visiting for a set time period. (Obj. 17:3–9). The Court agrees with Magistrate Judge Couvillier that the parties agreed to reside in the United States.

The parties booked a one-way ticket and traveled to Nevada in September 2024 with no set return date. While the parties discussed the possibility of returning to Argentina in January 2025 and only had travel health insurance for E.E. paid for until that time, the Court finds that the parties agreed to reside in Nevada in late November 2024. (*See* Travel Ins., Ex. T to Pet., ECF No. 1-3). Based on Respondent's testimony, Petitioner and Respondent had an hour-long phone call in November 2024, during which Petitioner agreed, among other things, to move to the United States. This agreed upon list was memorialized in a text message, but Petitioner later reneged on his acceptance. The Court has read the evidentiary hearing's transcript and agrees with the Magistrate Judge that "Respondent's testimony about the parties' agreement [via phone call memorialized in text message], including the agreement to stay living in the United States, was more credible and that Petitioner's conduct manifested his assent to the agreement, including agreeing to live in the United States." (R&R 8:23–9:2). "While [P]etitioner testified during the hearing that he did not agree to the agreement's term to stay in Nevada, the parties continued living in Nevada without evidence of any contemporaneous protest from [P]etitioner thereby manifesting his contemporaneous assent to staying in Nevada." (*Id*. 9:4–7). Despite Petitioner disputing that he ever agreed to move to the United States, the Court agrees with Magistrate Judge Couvillier that Respondent's testimony is more credible.

Moreover, the Court agrees with Magistrate Judge Couvillier that "the parties engaged in many conversations during their time in Nevada weighing the pros and cons of leaving Argentina and residing in the United States." (R&R 9: 15–16). The evidence shows that the parties engaged in serious conversations about staying in the United States, indicating their intention to abandon Argentina. For example, although the lease that they had on their rental in Argentina indicated that they had to give 60 days-notice to break the lease, the evidence shows that the parties had conversations with the landlord about breaking the lease with 30-days'

notice. Petitioner avers that the lease is proof of E.E.'s habitual residence in Argentina, but the lease coupled with Respondent's testimony shows the Court otherwise. (Obj. 11:1–3); (*See generally* Argentina Lease, Ex. G. to Pet., ECF No. 1-3). This conversation demonstrates that the parties discussed abandoning Argentina. Considering all of this evidence, the Court finds that the parties agreed to reside in the United States in November 2024.

## 2. Totality of the Circumstances

Even if the parties did not agree to reside in the United States, the Court nonetheless agrees with the Magistrate Judge's determination that the totality of the circumstances establishes that the United States is E.E.'s habitual residence. The United States Supreme Court expressly adopted the "totality of the circumstances" test to determine a child's habitual residence. *See generally Monasky v. Taglieri*, 589 U.S. 68 (2020). Locating a child's home is a fact-driven inquiry, and courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Id*. at 68 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)). The intentions and circumstances of caregiving parents are relevant considerations for infant children because they depend on their parents as caregivers. *Id*. Importantly, however, no single fact is dispositive across all cases. *Id*. "Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus." *Id.* at 78. *Monasky* made clear that "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Id.* at 81.

Magistrate Judge Couvillier determined that based on the totality of the circumstances and evidence presented, E.E.'s habitual residence was in the United States by November 2024,

and certainly by December 22, 2024, the date that Petitioner was served with divorce papers. (R&R 10:4–6). The Magistrate Judge explained that E.E. is an infant and has been principally reared and cared for by Respondent. (R&R 10:6–7). The evidence demonstrated to Magistrate Judge Couvillier that E.E. is surrounded and supported by Petitioner's parents and other family and friends in Nevada. (Obj. 10:8–10). "Immediately prior" to the Petition being filed, E.E., Respondent, and Petitioner had been living in Nevada for four months. Thus, Magistrate Judge Couvillier found that the focal point of E.E.'s life at that moment—the family and social environment in which his life had developed—was being in the parties' care in the United States. (Obj 10:12–13). The Magistrate Judge ultimately concluded that the United States was the parties' social environment and residency at the relevant time period. (*Id*. 10:13–14).

Petitioner argues that the Magistrate Judge was incorrect, relied too heavily on child custody considerations rather than Hague Convention factors, and that the Court should consider the following factors when determining E.E.'s habitual residence: parental employment, home purchase, moving of belongings, acquisition of driver's license, marital instability, length of stay in the country, and the child's age. (*See generally* Obj.).

### a. Employment Status

Petitioner works on American political campaigns and political marketing, which primarily emanates from Los Angeles, California. (R&R 2:14–15). He also works for a family business located in Argentina. (*Id*. 2:16). Respondent has worked as a stay-at-home mother since E.E. was born. (Resp. 7:5, ECF No. 38). Petitioner argues that because the parties' employment status did not change between 2024 and 2025, this factor favors Argentina being E.E.'s habitual residence. (*Id*. 7:4–12). Petitioner relies on a Third Circuit case, *Feder v. Evans-Feder*, to support this argument. (*Id*. at n.14); see 63 F.3d 217, 218–19, 224 (3d Cir. 1995). In *Feder*, the court found that the child's habitual residence was in Australia after petitioner father was terminated from his job in the United States, accepted a job in Australia,

the family moved to Australia, and child was enrolled in school there. *See generally id*. Indeed, the employment of one or both parents in a country to which the parents recently moved can be evidence of establishing a new habitual residence. *Id*. Conversely, leaving one's employment in a country can be evidence of leaving a prior state of habitual residence. *Id*. But the Court is not persuaded that *Feder* applies here. The parties here were not terminated from a job in the United States and then sought employment elsewhere causing them to relocate. Petitioner maintained his United States job, which he had prior to moving to Argentina, as well as a job in Argentina, regardless of where he was living. (Obj. 7:7–9). Moreover, Respondent worked as a stay-at-home mother in both locations. Thus, the Court does not find that this factor weighs in favor of Argentina being E.E.'s habitual residence as Petitioner suggests.

### b. Home Purchase

Next, Petitioner argues that the United States is not E.E.'s habitual residence because the parties did not purchase a home in the United States or look for a rental property. (Obj. 7:13–8:2). Indeed, the purchase of a home can be evidence of establishing habitual residence. *See e.g., Feder*, 63 F.3d at 224. But here, the parties never purchased a home in Argentina when living there either. By Petitioner's logic, E.E.'s habitual residence could also not be in Argentina. Because the parties never purchased a home in either country, the Court considers the circumstances of the parties' and E.E.'s living situation in the United States. Based on the testimonies given at the hearing, the Court finds that while the parties had not looked for a rental property while residing with Respondent's parents, they made efforts to make a home in Respondent's parents' house by setting up a nursery area for E.E. and a home office for Petitioner to work from. For all intents and purposes, the parties created a home in the United States. Thus, the Court finds that this factor weighs in favor of the United States being E.E.'s habitual residence.

### c. Movement of Belongings

Next, Petitioner argues that E.E.'s habitual residence is Argentina because the parties left most of their belongings there when they traveled to the United States. (Obj. 8:3). Petitioner cites to an Eighth Circuit case, *Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003), to support his argument. (*Id*. 8:8). It is true that in *Silverman*, the court determined that the movement of family belongings can establish intent to move to a new habitual residence. *See Silverman*, 338 F.3d at 898. In that case the court explained that "[t]he [trial] court should have determined the degree of settled purpose from the children's perspective, including the family's change in geography along with their personal possessions and pets . . . ." *Id*. Applying that same consideration to the present case, the Court finds that while the parties kept many of their belongings in Argentina as established by testimony and photographic evidence, (Photos of Argentina Home, Ex. S to Pet., ECF No. 1-3), they still traveled with a lot of possessions, including six suitcases worth of belongings, and they shipped baby supplies to the United States to use as well. Based on "the degree of settled purpose from [E.E.'s] perspective," as Petitioner has asked the Court to consider, (*see* Obj. n.16), the Court finds that the movement of six suitcases, along with the shipment of baby supplies demonstrates an intent to move. These pieces of evidence, coupled with others discussed throughout the Order, establish that E.E. settled in the United States. Thus, this factor weighs in favor of finding that the United States was E.E.'s habitual residence.

### d. Driver's License

Petitioner next argues that because neither Petitioner nor Respondent obtained a new driver's license in 2024, the Court should consider this a neutral factor. The Court disagrees. Some courts have found that obtaining or attempting to obtain a driver's license or professional license in a new country is evidence of intent establish a new habitual residence. *See e.g.*, *Silvestri v. Oliva*, 403 F. Supp. 2d 378, 381, 385–86 (D.N.J. 2005). But both Petitioner and

Respondent maintained, and still have, driver's licenses issued in the United States, even when they lived in Argentina. (R&R 3:15–16). The Court finds that that the retention of driver's licenses issued in the United States, even when they lived in Argentina, demonstrates that Argentina was a temporary living situation. Thus, this factor weighs in favor of determining that the United States is E.E.'s habitual residence.

### e. Marital Instability

Petitioner further contends that E.E.'s habitual residence is Argentina because the parties' marriage broke down in the United States. (Obj. 8:13). The Court again looks to *Monasky* for guidance. There, the parties moved to Italy, the marriage broke down, and then the mother fled with their child to the United States. (*See generally Monasky*, 589 U.S. 68). The *Monasky* Court considered where the marriage broke down when balancing the totality of the circumstances and ultimately concluded that the child's habitual residence was in Italy. *Id*. The facts here are very different. The parties agreed to travel to Nevada and during their stay they made a home in the United States at the same time their marriage was breaking down. (*See generally* R&R). This factor is a closer call because the parties were making a home in the United States while their marriage was facing instability. Accordingly, the Court finds that this is a neutral factor.

### f. Length of Stay

Petitioner next avers that the Court should consider E.E.'s length of stay in each country as a neutral factor. (Obj. 9:5). Petitioner also argues that the Magistrate Judge erred when he considered that the parties have been in Nevada for over sixth months. *(Id.* 5:5–9 (citing R&R 15:22)). Petitioner contends that the correct consideration is that when the Petition was filed, the parties had only been in Nevada for less than four months. (*Id*. 5:6–9). But the Magistrate Judge correctly considered the four-month timeline when weighing the totality of the circumstances to determine E.E.'s habitual residence. (*See* R&R 10:10–12). Moreover,

Petitioner's argument that this is a neutral factor is unconvincing. E.E. was in Argentina from the time he was born in mid-June 2024 to when the parties traveled to Nevada on September 6, 2024, for a total of approximately 11 weeks. (*See* Birth Certificate, Ex. A to Pet., ECF No. 1-3); (*see also* Pet. ¶ 41). Then E.E. was in Nevada from September 6, 2024, to the time Petitioner filed his Petition on January 2, 2025, for a total of approximately 16 weeks. (*See generally* Pet.). Even using Petitioner's desired timeline, which the Magistrate did do, E.E. was still in the United States longer—much longer considering E.E. is an infant—than he was in Argentina. Thus, this factor weighs in favor of the United States being E.E.'s habitual residence.

### g. Place of Birth and Child's Age

Lastly, Petitioner relies on *Holder v. Holder* to argue that Argentina is E.E.'s habitual residence because he was born there. (Obj. 12:8–10); *see* 392 F.3d 1009, 1019 (9th Cir. 2004). *Holder* explained that when determining a newborns' habitual residence, "[t]he place of birth is not automatically the child's habitual residence." *Id.* at 1020. But *Holder* also observed that "if a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country." *Id*. "Once this initial habitual residence has been established, we recognize that it is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents." *Id*. Thus, "the inquiry is, more generally, whether the children's lives have become firmly rooted in their new surroundings." *Id*. at 1019. Here, after considering the testimony and evidence presented during the hearing, the Court finds that E.E.'s life was firmly rooted in the United States because he had all of the necessary supplies for a newborn, was being primarily reared by Respondent, cared for by Respondent's family members, and was placed on a vaccination schedule in the United States. (*See generally* R&R).

1 Thus, considering the child's age, his life had become rooted in the United States establishing
2 his habitual residence here.
3       When the Court applies the definition of habitual residence to the facts and considers the
4 totality of the circumstances, it concludes, just as Magistrate Judge Couvillier did, that the
5 United States was E.E.'s habitual residence immediately prior to his retention in the United
6 States and was therefore not wrongful.[3]  E.E. traveled with his mother and father from
7 Argentina to the United States where he was to live for, at the very least, the foreseeable future.
8 He stayed in the United States for 16 weeks, or 60% of his life, prior to the Petition being filed.
9 Although the parties viewed the United States very differently, both agreed to travel to that
10 country and be there with one another and E.E.  They did what parents intending on moving
11 do—they made a home with Respondent's parents by setting up a workplace for Petitioner and
12 a nursery area for E.E., and they began setting up medical care for E.E.  That Petitioner did not
13 intend to remain in the United States permanently does not negate that the totality of the
14 circumstance's points to the United States as being E.E.'s habitual residence.
15       In sum, the Court concludes that E.E.'s habitual residence is the United States.  Because
16 the Court finds that Petitioner does not meet his burden of showing that the retention was
17 wrongful, it need not address the remaining questions articulated in *Mozes*.[4] 239 F.3d at 1070;
18 22 U.S.C. § 9003(e)(1)(A).  Thus, Petitioner's Petition is DENIED.
19 ///
20 ///

---

[3] Petitioner argues that the Court should find that a wrongful retention occurred on December 22, 2024, when Petitioner was served with divorce papers. (Obj. 15:5–6).  But for the reasons articulated in this Order, the Court finds that no wrongful retention ever occurred.

[4] Petitioner asked the Court to consider certain exhibits not cited by the Magistrate Judge. (*See* Obj. 10:17–11:7). The Court did so and finds that the exhibits do not move the needle in favor of Petitioner's position.  Petitioner also requested that the Court receive further evidence to determine Petitioner's credibility and hold another evidentiary hearing. (*Id.* 11:8–9).  The Court finds that Petitioner could have brought forth the evidence at issue during the evidentiary hearing because it was available prior to the hearing.  Thus, the Court denies Petitioner's request to hold a second evidentiary hearing.

IV. **CONCLUSION**

**IT IS HEREBY ORDERED** that the R&R, (ECF No. 35), is **ACCEPTED AND ADOPTED IN FULL**.

**IT IS FURTHER ORDERED** that Petitioner Alexis Edelstein's Petition, (ECF No. 1), is **DENIED**. Any requests for attorneys' fees and costs are also **DENIED**.

**IT IS FURTHER ORDERED** that Respondent Tara Michelle Nelson's Motion to Dismiss the Petition, (ECF No. 18), is **DENIED as MOOT**.

The Clerk of Court is kindly directed to close the case.

**DATED** this __16__ day of May, 2025.

_____
Gloria M. Navarro, District Judge
United States District Court